**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JANE DOE, | : | Civil No. 5:25-cv-02838-JMG |
| Plaintiff, | : | |
| | : | |
| v. | : | JUDGE JOHN M. GALLAGHER |
| | : | |
| PINE FORGE ACADEMY, *et al.,* | : | |
| Defendants. | : | JURY TRIAL DEMANDED |

**PLAINTIFF'S PRETRIAL MEMORANDUM**

Now comes Plaintiff, by and through the undersigned counsel, and hereby files this Pretrial Memorandum consistent with Local Rule 16.1, the Policies and Procedures of Judge John M. Gallagher, and this Court's Second Amended Scheduling Order (Doc. 36).

Respectfully submitted,

**CONSTANT LEGAL GROUP, LLP**

/s/ *Edward J. Kelley, III*
Edward J. Kelley, III Esq.
737 Bolivar Rd., Ste. 440
Cleveland, OH 44115
(216) 333-6707
(216) 274-9365 (facsimile)
ed@constantllp.com

**Attorney for Plaintiff**

# TABLE OF CONTENTS

I.    Factual Summary of the Case ................................................................................. 1

    A.    Jane Was Born into a Seventh-Day Adventist Family........................................ 1

    B.    Jane Enrolled at Pine Forge Academy ............................................................... 1

    C.    Jane Was a Standout Student Over the Course of Her Time at Pine Forge........ 2

    D.    Jane Joined Pine Forge's Exceptional Choir Program........................................ 2

    E.    Jane Had a Friend at DuPont Park Who Was Sexually Abused by a Teacher, and Jane Was Called to Testify.................................................................................................. 3

    F.    Mr. Ferdinand Began Grooming Jane................................................................ 3

    G.    Jane's Friends Observe the Grooming................................................................ 6

    H.    Jane's Friends Report the Grooming to Adults at Pine Forge ............................ 7

    I.    Jane Reports the Grooming to Dean Kibler........................................................ 9

    J.    Jane Was Sexually Abused by Jason Ferdinand................................................ 10

    K.    Jane Did Not Report the Abuse to Pine Forge Academy Until Bringing This Claim ...... 11

    L.    Jane Was Not the First Person Groomed and Abused by Jason Ferdinand ...................... 11

    M.    Witness 1 Was a Standout Member of the Choir.............................................. 12

    N.    Witness 1 Was Groomed by Mr. Ferdinand .................................................... 13

    O.    Toni Hall Wrote a Letter to Mr. Ferdinand...................................................... 14

    P.    Mr. Ferdinand Kissed Witness 1...................................................................... 14

    Q.    Jane Doe Was Given a Nickname Based on Witness 1's Name....................... 14

    R.    Witness 1 Told Dean Kibler About Dangerous Men in the School's Choir Program Prior to Jane's Abuse .......................................................................................... 15

    S.    Pine Forge Academy Did Nothing to Stop the Abuse ..................................... 16

    T.    Pine Forge Academy Had a Culture of Allowing Adults to Engage in Inappropriate Behavior with Students ............................................................................... 18

    U.    Jane Attended Oakwood University After Pine Forge, and Mr. Ferdinand Followed ..... 20

    V.    The Effect of The Sexual Abuse on Jane's Life Cannot be Overstated........................... 21

II.    Plaintiff's Claims ................................................................................................. 22

III.    Plaintiff's Relief Sought ..................................................................................... 23

IV.    List of Witnesses................................................................................................. 23

V.    Exhibit List......................................................................................................... 23

VI.   Stipulations of Counsel ........................................................................................... 25

VII.  Statements of Objection ......................................................................................... 27

    A.   Complaint and Answer – D1 and D2 ............................................................... 27

    B.   Defendants' Discovery Responses – D3, D24, D25, D33, ................................ 28

    C.   Plaintiff's Instagram Posts – D21 ................................................................... 28

    D.   Deposition Transcripts – D34-D44, D47, D50, D53 ....................................... 30

    E.   Online Description of Parise Nichelle – D56 ................................................... 30

    F.   No Record Statement from Dr. Katherine Smith – D57.................................... 30

VIII. Deposition Testimony to be Offered....................................................................... 31

    A.   Camille Kibler.................................................................................................. 31

    B.   Toni Hall .......................................................................................................... 31

    C.   Helen Peace...................................................................................................... 32

    D.   Cynthia Poole................................................................................................... 32

    E.   Teresa Best – Corporate Representative ........................................................... 33

    F.   Candace Anson ................................................................................................ 33

    G.   Thaina Blot....................................................................................................... 35

IX.   Statement of Anticipated Legal Issues.................................................................... 36

X.    Conclusion ............................................................................................................. 36

**PRETRIAL MEMORANDUM**

**I.    Factual Summary of the Case**

The following factual summary is based upon depositions taken in this case, anticipated expert testimony, as well as occasional background information provided by counsel for context. The Plaintiff will be referred to as "Jane" or "Jane Doe." There are other victims of sexual abuse and/or other inappropriate conduct mentioned in this Factual Summary. To protect their identities, they will be referred to by pseudonyms in this Memorandum. Two of these victims gave depositions in this case and it is anticipated that their testimony will be heard by the jury. They will be referred to as "Witness 1" and "Witness 2." Other students who were subject to misconduct will be referred to as "Student 1," "Student 2," "Student 3," and "Student 4."

The Defendants in this case are Pine Forge Academy and the Allegheny East Conference of Seventh-Day Adventists. The Allegheny East Conference owns and operates Pine Forge Academy. (Defendants' Response to Plaintiff's Interrogatory No. 2).

**A.  Jane Was Born into a Seventh-Day Adventist Family**

Jane was born in June of 1990. (Deposition of Jane Doe (hereinafter "Jane Depo" at 4:15-16). Her family was deeply engrained in the Seventh-Day Adventist religion. Jane attended DuPont Park Seventh Day Adventist School from Kindergarten to Ninth Grade before enrolling at Pine Forge Academy, a boarding school in Pine Forge, Pennsylvania. (Jane Depo at 47:1-9).

**B.  Jane Enrolled at Pine Forge Academy**

Jane enrolled at Pine Forge Academy for Tenth Grade in the Fall of 2005. (Jane Depo at 47:13-16). She attended the school for her Sophomore, Junior, and Senior years of high school, graduating in Spring 2008. (Jane Depo at 47:17-20). While attending, she lived in Kimbrough Hall, the girls' dormitory on campus.

1

### C. Jane Was a Standout Student Over the Course of Her Time at Pine Forge

Jane was the head of the National Honor Society at Pine Forge Academy, a society based on both academics and character. (Jane Depo at 54:1-6). Jane served as a Resident Assistant ("RA") in Kimbrough Hall at Pine Forge. (Jane Depo at 54:8-9). The Dean of Young Women hired the Resident Assistants. (Deposition of Camille Kibler (hereinafter, "Kibler Depo") at 75:10-12).

Jane also served as the Religious Vice President at Pine Forge Academy. (Jane Depo at 54:7-8). The Religious Vice President "worked in conjunction with the chaplain and the pastor to design the religious programs on the campus." (Deposition of Cynthia Poole (hereinafter, "Poole Depo") at 53:5-9).

In her senior year, Jane was given the Student of the Year Award. (Jane Depo at 54:13-14). Jane's Principal testified that:

> Student of the year award, since 1957, is an award that's given to a student who embodies what we call the Pine Forge spirit. It is an opportunity for students to vote, but for faculty to also review the votes and count out to see which student that the -- which student the students deem best represents them academically, socially, spiritually.

(Poole Deposition 104: 17-23).

### D. Jane Joined Pine Forge's Exceptional Choir Program

Pine Forge Academy had an outstanding choir program. It was led by Choir Director Jason Max Ferdinand ("Mr. Ferdinand"). Neil Thomas was the Choir's organist. Toni Hall was the Choir's accompanist. The Choir often traveled throughout the United States on a bus owned by Pine Forge Academy. Mr. Ferdinand, Mr. Thomas, and Ms. Hall were the main chaperones on Choir trips, but were almost always joined by a rotating group of faculty and staff from Pine Forge.

Jane auditioned for the Choir at Pine Forge as a sophomore and sang in the Choir all three years that she went to the school.

2

### E. Jane Had a Friend at DuPont Park Who Was Sexually Abused by a Teacher, and Jane Was Called to Testify

While Jane was at DuPont Park Seventh Day Adventist School, a classmate was sexually abused by a teacher. (Jane Depo at 72:9-15). This is relevant because it adds context to Jane's experience with Mr. Ferdinand.

The teacher was charged criminally and the case went to trial. Jane was subpoenaed to testify and was driven by the Pine Forge Principal Cynthia Poole to the trial. Jane testified:

> I sat at the trial and I watched how they -- how many of the other students and many of the other teachers treated her… and how she was just embarrassed and blamed, and she had to go to a court case, and it was just so confusing.
>
> So when it was happening -- something similar was happening to me or I thought something similar could possibly happen to me, I was really, really scared because, you know, all -- my parents had paid all this money to send me to this school. I didn't want to be remembered as like a victim. I didn't want to be remembered as someone who had gone through this…
>
> I think it was maybe a form of even denial as well as trying to stay a normal kid.

(Jane Depo at 76:10-77:7).

### F. Mr. Ferdinand Began Grooming Jane

There was a "stay-on-campus" Choir at Pine Forge Academy and about half of that Choir would travel for concerts across the United States and, on occasion, internationally. (Jane Depo at 50:12-16). Students were selected to travel for concerts on a trip-by-trip basis. (Jane Depo at 51:1-4). Jane went on almost every trip beginning in her Sophomore year. (Jane Depo at 68:13-14).

> It was very out of the ordinary, so much so that all the students would always say, well [Jane's] definitely – my nickname is [Jane]. They would say [Jane's] on the list, you don't have to look at it… That's when I noticed something was wrong because – or I felt was wrong because I felt like there were other singers that were better than me that should go every time.

3

(Jane Depo at 68:3-19).

Mr. Ferdinand began to text Jane. He texted her about how his day had gone. (Jane Depo at 73:7-8). He texted her about his career aspirations. (Jane Depo at 73:8-9). Mr. Ferdinand would talk to Jane about the problems in his marriage. (Jane Depo at 53:12-17).

"He told me that he loved me one time… I was very, very -- really scared when he told me that." (Jane Depo at 73:20-21). The "I love you" text was sent at least twice Jane's sophomore year. (Jane Depo at 81:2-5).

> I remember being very scared about these text messages -- because at the time, there was a -- a friend of mine who had been assaulted at my middle school, and I was called to testify in that case.

(Jane Depo at 72:9-15).

Mr. Ferdinand often made comments about Jane's appearance including how beautiful she was. (Jane Depo at 81:18-19). He would also talk about her "discretion" and how he was really glad that she didn't show anyone texts or "make any movements" after they were texting all day. (Jane Depo at 81:18-82:2).

Jane was asked by Ferdinand to be a Choir Worker. (Jane Depo at 61:7).[1] She knows she was a Choir Worker her Senior year, but did not recall whether she was a choir worker her Junior year. (Jane Depo at 61:19-62:1).

Mr. Ferdinand often took Jane off campus to eat at restaurants. (Jane Depo at 74:6). This ramped up her Junior year. (Jane Depo at 81:15-17). Dean Kibler "always let [Jane] go off campus with [Mr. Ferdinand]." (Jane Depo at 104:18-19). You will read later that Jane told Dean Kibler

---

[1] For context, a number of students at Pine Forge were "Workers" for certain groups on campus. You could be a Choir Worker, a Math Worker, Cafeteria Worker, etc. You would then have responsibilities to help the adults associated with the Choir, Math Department, Cafeteria, etc.

that she was uncomfortable with Mr. Ferdinand, and Dean Kibler still let Jane leave campus with him.

On Choir trips, Mr. Ferdinand would sit next to Jane on the bus. (Jane Depo at 89:3-4). Jane would sit by the window and Mr. Ferdinand would sit on the aisle. (Jane Depo at 89:1-2). He sat next to Jane about six times her Junior year and almost every Choir trip her Senior year. (Jane Depo at 92:11-15). Candace Anson was a student at Pine Forge Academy from 2003-2007. (Candace Anson Deposition (hereinafter "Anson Depo") at 13:13-14:3). Candace testified that she saw Jane and Mr. Ferdinand "snuggling" on the Pine Forge Choir bus. (Anson Depo at 57:6). She stated that the snuggling was "[m]aybe not sexual, but intimate, beyond the boundaries of their relationship." (Anson Depo at 57:6-8). This snuggling went on less than an hour. (Anson Depo at 76:10-18). The closest Pine Forge Academy adult would be within 10 feet of Jane and Mr. Ferdinand while the two were snuggling. (Anson Depo at 76:19-23).

On some Choir trips, Mr. Ferdinand booked too many children and so that the school's bus did not have enough seats. (Jane Depo at 102:1-1). On these occasions, Mr. Ferdinand drove his personal vehicle and had Jane ride with him. (Jane Depo at 102:1-7).

On Choir trips, Mr. Ferdinand made Jane come to his hotel room and iron his clothing. (Jane Depo at 59:19-60:1). When asked whether she was forced to do this, Jane responded:

> Well, I was in a very [compromising] position. I was very scared, because when he asked me to do this, I was in his hotel room by myself with him, one of these times by myself with him and Mr. Neil Thomas is [sic] their hotel rooms when he asked me to iron his clothes.

(Jane Depo at 60:3-8).

During Jane's Junior year the choir took a trip to Bermuda. (Jane Depo at 84:17-22). All of the girls on that Choir trip stayed in quarters together in Bermuda except Jane. (Jane Depo at 85:7-15). Mr. Ferdinand had gotten Jane her own quarters that were not very far from his quarters.

5

(Jane Depo at 85:16-17). On the trip, Mr. Ferdinand spent hours alone with Jane. (Jane Depo at 85:21-86:1).

### G.  Jane's Friends Observe the Grooming

Bianca Hall was a friend of Jane and attended Pine Forge from 2005-2007. (Deposition of Bianca Hall (hereinafter, "Bianca Depo") at 20:11-12). Bianca "had to beg [her] parents to send [her] to that school." (Bianca Depo at 27:22-23). Bianca was the Academic Vice President of the school as well as the leader of the Praise Team. (Bianca Depo at 138:16-20). In 2022 she was given the Pine Forge Academy Meritorious Alumni Award which is given to alumni who have excelled in their careers and uphold the standards of the institution in their respective communities. (Bianca Depo at 139:20-140:5). She is currently an OBG/YN working at a hospital in New York City.

Arielle Freels was a friend of Jane and attended Pine Forge Academy from 2004-2007. (Deposition of Arielle Freels (hereinafter ,"Arielle Deposition") at 13:21-14:2).

Bianca witnessed Mr. Ferdinand sitting next to Jane on bus trips. (Bianca Depo at 42:7-9). She witnessed Mr. Ferdinand frequently talking to Jane on the phone, and texting her. (Bianca Depo at 44:4-5).

On one occasion, Bianca and Arielle got access to Jane's phone and saw a text message that said "I love you." (Bianca Depo at 45:9-12); (Arielle Depo at 27:9-10). Other texts said "I miss you." (Bianca Depo at 46:6).

On one occasion, Arielle heard that Jane was alone in a hotel room with Mr. Ferdinand. (Arielle Depo at 27:10-11). Arielle went to the room, knocked on the door, saw the two alone in the room, and told Jane it was time to go. (Arielle Depo at 41:3-22).

Bianca testified that "I'm a city girl, so I'm not one of these little Pine Forge kids that never seen anything before, and I know what this is." (Bianca Depo at 80:3-7).

6

**H.  Jane's Friends Report the Grooming to Adults at Pine Forge**

Camille Kibler was the Head Dean for Young Women at Pine Forge Academy from 2003-2009. (Kibler Depo at 20:19-23). Prior to that time, she was the Assistant Dean for Young Women from 1999-2003. (Kibler Depo at 20:10-18). Helen Peace was the Assistant Dean for Young Women at Pine Forge Academy from 2005-2010. (Deposition of Helen Peace (hereinafter, "Peace Depo") at 18:12-18). Both women lived in the dorms with the students and were responsible for their safety.

Dean Peace testified in this case that it was a professional priority of hers at Pine Forge to keep the girls safe from sexual abuse. (Peace Depo at 21:24-22:1). Bianca and Arielle had a conversation with Dean Peace where they conveyed that Mr. Ferdinand made some of the girls feel uncomfortable. (Bianca Depo at 58:19-21). In their conversation, Bianca and Arielle told Dean Peace that they knew a student who they thought Ferdinand was inappropriate with. (Bianca Depo at 58:25-59:4). They talked to Dean Peace about observing "a relationship that [Mr. Ferdinand] was having that was making [them] uncomfortable, and [they] weren't sure how to handle it." (Bianca Depo at 59:14-16); (see also Arielle Depo at 51:12-14). It was phrased as "what do we do." (Bianca Depo at 59:18). The conversation was half an hour or less. (Bianca Depo at 58:13-14). Arielle testified that she "walked away feeling like there was no support for what we were trying to convey." (Arielle Depo at 50:17-19).

Bianca and Arielle also had a conversation with Dean Kibler about their concerns. (Bianca Depo at 66:18-20). Dean Kibler testified in this case that "it was my job to protect children as an educator." (Kibler Depo at 17:7-8). The students told Dean Kibler that they had a friend in an "inappropriate situation." (Bianca Depo at 68:1); (Arielle Depo at 47:11-16). Bianca further shared that "Mr. Ferdinand sometimes makes the girls uncomfortable." (Bianca Depo at 68:3-4). The

7

essence of what she said was the guy made her feel creepy. (Bianca Depo at 70:8-10). Bianca was asked:

> Q. Did you express any concern for the safety of another student when you spoke to either Peace or Camille?
>
> A. So I would have to say yes, because I'm expressing that I felt like his conduct with the students were inappropriate, which is a safety concern.

(Bianca Depo at 70:11-17).

These reports were made while Bianca and Arielle were students at Pine Forge. Bianca and Arielle both graduated in 2007, a year before Mr. Ferdinand abused Jane. Therefore, these reports were made before the sexual abuse and if acted upon would have prevented the sexual abuse.

Bianca told the Deans that Mr. Ferdinand had been similarly inappropriate with other girls at the school prior to Jane:

> Q. And had you heard of any prior inappropriate conduct that is prior to [Jane] that Mr. Ferdinand had engaged in before [Jane]?
>
> A. Yes.
>
> Q. Had you heard that before or after your meetings with Dean Camille and Dean Peace?
>
> A. Before.
>
> Q. Did you share with either Dean Camille or Dean Peace anything about that?
>
> A. About –
>
> Q. I'm sorry, that being what you had heard of a previous inappropriate relationship.
>
> A. I don't think I specifically talked to them about the person. I think we referenced that there were other students that we knew he had been like this with.

8

(Bianca Depo at 71:6-21). Bianca carried a deeply-distraught attitude into the meetings with the Deans, as well as a sense of urgency. (Bianca Depo at 127:9-14; 128:6).

After the conversation with Dean Kibler, Arielle "felt very defeated in that we didn't have any support for what we were trying to convey." (Arielle Depo at 48:20-21).

Bianca also shared her thoughts on Mr. Ferdinand with Mr. Thomas. (Bianca Depo at 111:18-21). "It was less direct confrontation, and more sarcastic, like you and your friend are weird. Kind of like off -- offhanded comments." (Bianca Depo at 111:23-112:2).

In Bianca's Senior year, when her respect for Mr. Ferdinand started to wane, she made a lot of these offhanded comments to other adults at Pine Forge. (Bianca Depo at 125:20-23).

> Q. Did you ever go to [Principal Cynthia Poole], and talk to her about Mr. Ferdinand?
>
> A. No.
>
> Q. Why not?
>
> A. I didn't trust her.
>
> Q. And why didn't you trust her?
>
> A. Mistress has been -- never built a rapport with the students.

(Bianca Depo at 112:8-20).

### I.   Jane Reports the Grooming to Dean Kibler

Jane spoke with Dean Kibler about Mr. Ferdinand acting inappropriately with her in the Fall of her Junior year.[2] (Jane Depo at 114:17-115:3).

> [I]t was like starting to kind of rev [up] and I was starting to really get more scared about what to do and trying to figure out, you know, who could help me.

---

[2] This was over a year before she was sexually abused by Mr. Ferdinand.

I like went through the mental Rolodex of like who could I talk to. And, again, there was -- a lot of people had witnessed this inappropriate behavior and didn't help me, so I really didn't know who I could talk to, but I had like, you know, got enough courage to talk to her. And I -- she was taking me to get my hair done in Philadelphia, which is like an hour away from campus…

I was like oh, great. Like I remember thinking like I'll be by myself with her, so I could talk to her about it and maybe she can help me….

I was telling her, like, I was getting these inappropriate text messages from Jason Ferdinand and also like him and Mr. Thomas had like been with me a few times by myself, and that Ferd was like -- you know he would take me off campus and stuff like that.

And I remember her kind of like, you know, cutting me off and her telling me, amongst other things, but I specifically remember these words, that these things just happen. And I remember that because that's when my brain kind of like shut off, and I realized like, oh, she's not going to help me. She's -- trying to convince me that these things are okay.

And maybe I believed her. I don't know. But I told her, and she told me these things just happen.

(Jane Depo at 115:5-116:22).

## J. Jane Was Sexually Abused by Jason Ferdinand

In February or March of 2007 Jane was seventeen years old and a Senior at Pine Forge. (Jane Depo at 94:4-7). Mr. Ferdinand was sitting next to her on the bus traveling back to Pine Forge from a Choir trip at night. (Jane Depo at 94:13-16). Mr. Ferdinand had a coat or jacket that he laid over them from their chests down. (Jane Depo at 94:19-20). He said something about touching her and she started to black out a little bit. (Jane Depo at 95:1-4). Jane did not say "okay" and instead was numb, quite, and looking out the window. (Jane Depo at 96:19-97:2). "I did not want him to do it even if I didn't say no." (Jane Depo at 97:10-11).

Mr. Ferdinand started touching her body including private parts for about fifteen minutes. (Jane Depo at 95:4-6). He touched her breasts under her bra with his hands. (Jane Depo at 98:20-

10

21). He put his hand in her underpants and touched her vagina. (Jane Depo at 99:1-4). Jane did not recall whether Mr. Ferdinand penetrated her vagina with his fingers. (Jane Depo at 99:5-6).

The same type of sexual abuse occurred a second time, a couple of weeks after the first. (Jane Depo at 106:20:107:4).

### K. Jane Did Not Report the Abuse to Pine Forge Academy Until Bringing This Claim

Jane was asked why she didn't tell anyone from Pine Forge about the Sexual Abuse and responded:

> Because I was very scared. Again, what had happened to me -- what had happened to my friend in grade school and how she had to go to court and how she had to testify and how many people talked about her, I was scared to death. You know, as you could see, I was doing well in school. My parents had paid a lot of money for me to go there. I just wanted to -- you know, I had aspirations to become student of the year. I wanted to be a high school kid. I didn't want to be a victim….
>
> So I was scared. I was really, really scared.
>
> And I also probably was in denial too. A lot of this I didn't realize had – that it was even really wrong. I was still very confused because I had already told my Dean before this was happening -- happened, that inappropriate things were happening between [Mr. Ferdinand] and I that I didn't feel comfortable with. And she told me -- Dean Camille told me that these things just happen…
>
> I didn't know who to -- who would help.

(Jane Depo at 102:19-104:6).

### L. Jane Was Not the First Person Groomed and Abused by Jason Ferdinand

As a reminder, Jane attended Pine Forge Academy from Fall 2005 – Spring 2008. Prior to Jane's enrollment at Pine Forge, Witness 1 was a female student in the choir who was groomed and eventually kissed by Jason Ferdinand.

11

Witness 1 attended Pine Forge Academy from August 2001 – May 2005. (Witness 1 Deposition (hereinafter "Witness 1 Depo") at 12:4-8). Pine Forge was her "dream school." (Witness 1 Depo at 16:9-10).

Witness 1 testified to the following, which admittedly was not responsive to the question she was asked:

> Let me – and also before we get – now that we're getting into kind of the nitty-gritty of my testimony, I do want to also say something on the record. I love my alma mater. You know, I know that this isn't being called into question, but I need to say this for the record in case other people ever read this. I absolutely love Pine Forge Academy. I -- I [bleed] green and white, you know. Those are our school colors. Like that is something that I -- doing this right now is very uncomfortable, very painful for me because I feel extremely conflicted here. I love Pine Forge. I just went back to my 20th. Just being on campus was just so cathartic and cleansing for me. I love that institution.
>
> That being said, I am being deposed. So there is little option here. And I have to tell -- I have to tell the truth. I have to tell what happened to me. So that's number one. Number two, because I love it, I'm -- I'm learning that love is accountability. And I have to hold the school, I guess, accountable for the things that happened to me.

(Witness 1 Depo at 56:12-57:12).

### M. Witness 1 Was a Standout Member of the Choir

When Witness 1 was a freshman at Pine Forge she was a member of the Freshman Choir. (Witness 1 Depo at 23:24-25). Her sophomore-senior year she was a member of the normal Choir. (Witness 1 Depo at 24:4-5). Witness 1 described the Choir as "the football team… we're known for our choir." (Witness 1 Depo at 29:21-23).

12

### N.  Witness 1 Was Groomed by Mr. Ferdinand

Mr. Ferdinand would text Witness 1. (Witness 1 Depo at 58:7). He would tell her that he loved her. (Witness 1 Depo at 58:9-10). He would comment on her looks and say "you look so pretty today." (Witness 1 Depo at 58:12-15).

Mr. Ferdinand also sat next to Witness 1 on the Choir bus at night. (Witness 1 Depo at 58:17-19). When there wasn't enough room on the bus, Mr. Ferdinand would drive his personal vehicle and have Witness 1 ride with him. (Witness 1 Depo at 59:9-11). Mr. Ferdinand also would hold Witness 1's hand. (Witness 1 Depo at 59:1).

There were adults present on the bus trips. (Witness 1 Depo at 97:24-25). Dean Kibler specifically testified that she "frequently" attended Choir trips. (Kibler Depo at 59:10-12). The adults could look over and see that Mr. Ferdinand was sitting next to Witness 1 or "that [she] was leaning on his shoulder" or "he had a coat draped over us." (Witness 1 Depo at 98:1-4). "The adults present knew what was going on." (Witness 1 Depo at 98:10-11).

Overall, Witness 1 testified "he treated me like he was my boyfriend." (Witness 1 Depo at 59:25-60:1). "He's very talented, and he's in power… he was such an authority figure over us. He's praised everywhere he goes." (Witness 1 Depo at 150:22-151:6). "People love him. He is the football coach, essentially, there. They love him. He's the school cheerleader, mascot. Like he is - - he was the face of Pine Forge." (Witness 1 Depo at 156:6-10).

At trial, Plaintiff will call former FBI Agent Adrienne Isom Malin to discuss grooming, grooming techniques, grooming's effect on minors, and her review of this case's specific facts. Ms. Malin worked for the FBI for over 20 years, 10 of those years were spent with the Bureau's Behavioral Analysis Unit.

13

### O.  Toni Hall Wrote a Letter to Mr. Ferdinand

Toni Hall was the accompanist of the choir from 2001-2007. (Deposition of Toni Hall (hereinafter, "Hall Depo") at 15:15-16:4). She frequently went on choir trips and was present at practices. (Hall Depo at 17:8-10).

Mr. Ferdinand told Witness 1 that Toni wrote a letter to Mr. Ferdinand. (Witness 1 Depo at 101:1-5). The letter said that Toni Hall noticed that Witness 1 was in Mr. Ferdinand's office a lot in the evening. (Witness 1 Depo at 101:8-10). Witness 1 testified that the letter said "Jason, VJ is young, you know, she's sweet, you know, whatever is happening here, please stop, discontinue, cut this off. Whatever's going on, you know, don't do what you're doing." (Witness 1 Depo at 101:12-16).Toni Hall testified that she did not recall the letter. (Hall Depo at 22:18-24).

### P.  Mr. Ferdinand Kissed Witness 1

On the morning of Witness 1's graduation, Mr. Ferdinand asked her to come to the Music Building on campus. (Witness 1 Depo at 60:3-5). He told her "something to the effect of, you know, I'm going to miss you, you know, you're so special to me. I love you." (Witness 1 Depo at 60:8-10). He then kissed her on her lips. (Witness 1 Depo at 60:11-12). "It was a sexual kiss." (Witness 1 Depo at 79:4). Witness 1 was dazed, stunned, and stumbled. (Witness 1 Depo at 60:12-13).

### Q.  Jane Doe Was Given a Nickname Based on Witness 1's Name

When Jane enrolled at Pine Forge, she quickly was given a nickname of "Little [Witness 1]."[3] Jane testified that she was called "Little [Witness 1]" because they were implying "that I was going to be treated by [Mr. Ferdinand] how [Witness 1] was treated by [Mr. Ferdinand], and that's why they said that." (Jane Depo at 128:6-9).

---

[3] The nickname is omitted at this time to avoid identifying either victim.

Witness 1 made a trip back to Pine Forge a year after she graduated in the Fall of 2005, which was Jane's first year at Pine Forge. (Witness 1 Depo at 32:12-15; 36:7). On that trip, Witness 1 met Jane and Jane was already saying that "everybody tells me, like I'm the new you." (Witness 1 Depo at 32:3-5).

### R.  Witness 1 Told Dean Kibler About Dangerous Men in the School's Choir Program Prior to Jane's Abuse

Witness 1 had a conversation with Dean Kibler either her Freshman or Junior Year at Oakwood. (Witness 1 Depo at 92:17-19; 94:15-17). At this time, Witness 1 was hearing some things about what was happening at Pine Forge with the female students and it prompted a frank conversation with Dean Kibler. (Witness 1 Depo at 93:16-21).

In that conversation, Witness 1 told Dean Kibler "that she needed to watch out for the interactions between some of these male teachers and the female students." (Witness 1 Depo at 92:22-25). Dean Kibler proceeded to go down the list of male teachers and ask "[d]o I need to watch out for this teacher?" and Witness 1 would say yes or no. "And when she got to Jason Ferdinand, I said, Yes, you need to watch out for that teacher and female students. And there was another teacher that she listed, Neil Thomas, that I also told her she needed to watch out for that." (Witness 1 Depo at 93:3-9). Witness 1 told Dean Kibler to "be careful," "watch them with the female students," and "be diligent with the female students and those men." (Witness 1 Depo at 97:3-6).

During Jane's Junior year, Dean Kibler told Jane that Mr. Ferdinand did a good job of picking Jane to go on choir trips because Jane was very charismatic and reminded her of another girl that he had made a focal part of the choir, and that girl's name was [Witness 1]. (Jane Depo at 124:13-22).

### S.  Pine Forge Academy Did Nothing to Stop the Abuse

After Witness 1 learned that Jane was touched by Mr. Ferdinand, she thought:

> Dean Camille had already gotten warned, you know, by me. And then here another girl [Jane] is coming and saying, Hey, I'm in trouble… who's here? Who's here saving these girls? Who is here protecting these girls? Who's here protecting? No one was there to protect me, but, you know. And I told the wrong person. But it shouldn't have been the wrong person. She should have done something about this.

(Witness 1 Depo at 122:17-123:9).

Cynthia Poole was the Principal at Pine Forge from 2004-2010 (Poole Depo at 24:24-25:11). She testified that the job of the Deans of Young Women at Pine Forge included standing *in loco parentis* to the students.[4]  (Poole Depo at 47:5-6). Poole testified that "an adult can pretty readily pick up on undue behavior with a young person" and that "too much undue attention" from one adult to one child would be a sign of sexual abuse. (Poole Depo at 60:12-13; 59:14-18).

Ms. Poole testified that she didn't recall any trainings for adults at Pine Forge Academy about what was appropriate and what was inappropriate in terms of the adults' interactions with the students. (Poole Depo at 63:16-64:2).

Ms. Poole testified that an adult male should never take a female student off campus alone at Pine Forge Academy. (Poole Depo at 76:23-77:1). Kibler agreed. (Kibler Depo at 51:19-52:7). Dean Peace didn't recall whether it was a policy at Pine Forge to prohibit female students from being alone in the car with male faculty members, but did testify that "it just seems very inappropriate." (Peace Depo at 39:6-12). All faculty and staff at Pine Forge Academy should have known that it was a policy that a male staff or faculty member should not be in the car alone with a female student. (Poole Depo at 77:11-18).

---

[4] She volunteered this Latin phrase in an answer, it was not in counsel's question.

Ms. Poole agreed that, while she was principal at Pine Forge, any physical contact between a faculty and staff member and a student was prohibited. (Poole Depo at 80:4-7).

Dean Kibler testified that she first became familiar with the term "grooming" as it relates to an adult who is interested in a sexual act with a minor a few weeks before her deposition, which was October 2025. (Kibler Depo at 31:9-15). While working at Pine Forge, Dean Peace would be concerned if an adult was grooming a child. (Peace Depo at 29:10-13). She was on the lookout for grooming, which she testified involved the adult singling the student out and giving them special and preferential treatment. (Peace Depo at 29:14-20). Dean Peace did not recall any training at Pine Forge related to grooming prior to 2008. (Peace Depo at 34:20-22). Ms. Poole also testified that she did not recall any training on grooming. (Poole Depo at 64:7-10).

Dean Kibler testified that as the Dean of Young Women she had a responsibility to stop students from spending time with faculty if she believed the faculty were engaging in an inappropriate relationship with the student. (Kibler Depo at 46:8-23). She "absolutely" exercised that right over the course of her ten-year career at Pine Forge. (Kibler Depo at 47:14-16). When asked what faculty were involved in those situations, she testified "I cannot recall. Within ten years there were a lot of people." (Kibler Depo at 47:17-23).

Witness 1 testified that "Pine Forge is very much understaffed." (Witness 1 Depo at 28:2-3). "The faculty at Pine Forge are tired, and they are overworked." (Witness 1 Depo at 146:11-12).

> This was overlooked. This was not even overlooked. This was ignored. This was -- I believe it was seen. And it just -- it was allowed to happen.

(Witness 1 Depo at 146:13-17).

Plaintiff will call Dr. William Bainbridge at trial in this matter. Dr. Bainbridge has a Master's Degree in Educational Leadership and Personnel Management and a Ph.D. in Educational

17

Leadership and Business Administration. Dr. Bainbridge has reviewed the evidence in this case and will opine that Defendants did not act to keep Jane Doe safe from foreseeable sexual harassment and abuse.

### T. Pine Forge Academy Had a Culture of Allowing Adults to Engage in Inappropriate Behavior with Students

Deposition testimony in this case reveals multiple inappropriate relationships between adults at Pine Forge and the school's students.

Jason Ferdinand had an inappropriate relationship with Jane, Witness 1, Student 1 (Jane Depo at 223:4), Student 2 (Jane Depo at 223:9), Student 3 (Jane Depo at 223:13), and Student 4 (Jane Depo at 223:15; Witness 1 Depo at 104:12).

Witness 2 attended Pine Forge Academy from 2002 – 2006. (Deposition of Witness 2 (hereinafter, "Witness 2 Depo") at 8:23-9:1). When Witness 2 enrolled at Pine Forge, Neil Thomas was her "campus father." (Witness 2 Depo at 27:7-10). This was part of a broader program at Pine Forge to "adopt families within the campus since we're away from our biological families and we're living in a new place." (Witness 2 Depo at 27:10-16). Witness 2 testified "it was fine until it wasn't." (Witness 2 Depo at 27:20).

> And one of our, one of our home [leaves], he had to pick me up from the airport, he was to pick me up from the airport and he brought me to his house. He was like, yeah, I just wanted to show you where I live, whatever. It was fine until he showed me his bedroom and the way that he was looking at me, like I was afraid that something was going to happen. So I was like, can you take me back to the dorm now? And he was like, no, let's just stay awhile. And I was, like, no, I need to go back to the dorm now and he took me back. But it was a crazy ride back. He was swerving all down the Manatawny, which is like the road that we got to go to the dorm.
>
> So I ran inside. I was crying like crazy, running in, I ran straight to my room. The next morning Dean Camille called me downstairs and she was best friends with Neil Thomas. She called me downstairs. She asked me what happened. She saw me crying when I ran into the dorm the night before. I explained it to her. She called me a liar.

18

> She didn't change her tune until I described his place to her and that's when she came up with, you're going to write a letter telling him to never talk to you again and I'm going to deliver it to him.

(Witness 2 Depo at 28:2-25). This happened in 2003. (Witness 2 Depo at 30:8-13).

In addition to telling Dean Kibler, Witness 2 also told Norman Niles, a teacher at Pine Forge, about the incident with Mr. Thomas. (Witness 2 Depo at 33:22-34:5). Witness 2 told Mr. Niles within the first two years of her graduation from Pine Forge. (Witness 2 Depo at 34:6-9). She knows this was the time frame because she started dating Mr. Niles shortly after she graduated from Pine Forge. (Witness 2 Depo at 42:17-43:4). He texted her that he thought she was pretty a few days after graduation. (Witness 2 Depo at 42:23-24).

> I didn't group [Mr. Niles] in with the teachers at Pine Forge that I knew were like that. To me it was different, you know, because he didn't express anything to me while I was there. It was after we graduated. So I didn't, I never saw him that way. And then, you know, now it just feels like it's one party, one party of a whole bunch of male teachers that liked little girls.

(Witness 2 Depo at 43:7-14).

Witness 2 also described the incident to Nurse Leftridge at Pine Forge without saying which teacher specifically was involved. (Witness 2 Depo at 30:8-13).

Separate from and prior to the incident when Mr. Thomas' drove Witness 2 to his home, Mr. Thomas also sent Witness 2 pictures of his penis. (Witness 2 Depo at 35:19-25; 42:9-12). He sent these pictures on two or three occasions. (Witness 2 Depo at 42:13-16).

Mr. Thomas was the closest adult to the inappropriate relationship Mr. Ferdinand forced upon Jane. It is unsurprising that he did nothing to protect Jane given the conduct he himself was engaging in.

Ms. Anson testified regarding other adults at Pine Forge acting inappropriately. She testified that she saw young male students sitting in Dean Camille's lap. (Anson Depo at 23:14-

19

23). Ms. Anson also testified that a history teacher got a back massage from a student. (Anson Depo at 24:11-19). Ms. Anson further testified that "Dean Perry told one of my classmates she had a big ass." (Anson Depo at 28:7-8). Upon information and belief, Dean Perry was a male and a Dean of Young Men at Pine Forge.

Ms. Anson also testified about Mr. Niles, who is discussed above. Ms. Anson testified that Mr. Niles would hang out with a student at Pine Forge late at night, call her on the phone after 9:00pm, and message her on the phone after midnight. (Anson Depo at 28:24-29:21).

### U. Jane Attended Oakwood University After Pine Forge, and Mr. Ferdinand Followed

Mr. Ferdinand told Jane "that he would never go to Oakwood, they were recruiting him to come teach there and that he would never go there." (Jane Depo at 73:10-12). "I just remember – remembering that specifically because I thought that it was going to be my way to escape from him and escape if I went to Oakwood, because he said he was never going to go there." (Jane Depo at 73:12-16).

Pine Forge was also a feeder school for Oakwood. (Jane Depo at 139:3). "Everybody goes to Oakwood… if you go to Pine Forge, you go to Oakwood" (Witness 1 Depo at 125:18-20). Jane received a scholarship to go to Oakwood. (Jane Depo at 139:3). Her grandparents went to Oakwood. (Jane Depo at 139:6-7). Her mother went to Oakwood. (Jane Depo at 139:7). Jane did not remember applying to any other college. (Jane Depo at 139:13-14). Jane only found out that Mr. Ferdinand would be going to Oakwood at her Pine Forge graduation, after her college choice had been made. (Jane Depo at 139:19-22).

Jane and Witness 1 got to know each other at Oakwood and eventually realized that Mr. Ferdinand had groomed and sexually abused each of them. "I had always heard that she was the little [Witness 1]. And I suspected. So we kind of just started talking and, you know, we -- we

20

literally were finishing each other's sentences." (Witness 1 Depo at 109:12-16). They continued to share about their experiences, "it was like we were reading from a script," until Jane revealed to Witness 1 that Mr. Ferdinand had taken the touching to another level with her. (Witness 1 Depo at 110:9; 111:13-15).

## V.  The Effect of The Sexual Abuse on Jane's Life Cannot be Overstated

The abuse at Pine Forge has had a significant effect on Jane's life. The following information is drawn from Jane's Interrogatory Responses (unless otherwise cited) because Defendants did not ask about much of this in her deposition.

The abuse at Pine Forge has affected most romantic and platonic relationships Jane has had. After high school, she has felt unable to recognize whether someone is trying to be her friend or trying to harm her as the trust she put in Pine Forge and Ferdinand was betrayed. She has been hesitant to engage in new romantic relationships out of fear of being hurt, mistreated, or disrespected. She also has issues with authority.

Witness 1 testified that she witnessed Jane struggling with relationships in college. (Witness 1 Depo at 128:8-13). Jane found it hard to trust and hard to value herself. (Witness 1 Depo at 128:12-13). "She felt like she wasn't worthy of the kind of love that she is worthy of." (Witness 1 Depo at 129:19-21). "It was more than just he touched her. It was like he -- he messed up the guardrails that we should all -- that we all have." (Witness 1 Depo at 149:16-19).

Jane became a hyper-performer while she was being groomed and that has continued throughout her life. At Pine Forge, she excelled in school and extracurriculars as a means of escapism to disassociate from the inappropriate actions of Mr. Ferdinand.  (Jane Depo at 65:1-8). This followed in her professional life and led to times of extreme burnout. This is common for victims of sexual abuse: to overperform in all aspects of life to make it seem like everything is okay.

21

Jane has attended therapy with different providers intermittently over the last five years. She testified "I do therapy or any type of healing intermittently when I feel like I need it. It's not something that I do consecutively. The point of healing work is that you shouldn't be dependent upon it. So you go when you need it." (Jane Depo at 28:5-9).

Jane has struggled with body dysmorphia. She spent time fixated on her appearance, diet, and weight. She felt she had to "fix" her own body.

Plaintiff has hired a Clinical Psychologist as an expert in this case. Defendants have hired a Psychiatrist. Each administered the PCL-5 which is a standard test used to diagnose Post-Traumatic Stress Disorder. It is scored on a scale of 0-80. When Plaintiff's expert evaluated Plaintiff, she scored a 53/80. When Defendants' expert evaluated Plaintiff, she scored a 46/80. Any score above 33 is sufficient for a primary diagnosis of PTSD.

## II.    Plaintiff's Claims

Plaintiff bring Negligence claims against the Defendants under various theories. These include traditional negligence duties to act reasonably under the circumstances, but also the evidence will support an instruction that the Defendants were in a special relationship with the Plaintiff and thus had an elevated duty to protect her from harm. Separately, Defendants had a duty to supervise their employees and ensure that their employees did not present a risk to their students.

Plaintiff also brings claims for Vicarious Liability against the Defendants to hold the Defendants liable for the negligence of their employees under the theory of respondeat superior.

Defendants negligence, and the negligence of their employees, were both causes of Plaintiff's injuries.

22

### III.　Plaintiff's Relief Sought

Plaintiff seeks a judgment against the Defendants in the amount determined by the jury that will compensate Plaintiff for her damages.

### IV.　List of Witnesses

Plaintiff continues to work with the Defendants and the Court to determine whether some of the following witnesses will testify live in person at trial or via deposition. Addresses and other contact information was previously shared with Defendants.

1) Plaintiff;
2) Candace Anson;
3) Cassandra [Doe];
4) Nathaniel [Doe];
5) Xavian [Doe];
6) William Bainbridge, Ph.D.;
7) Theresa Best, individually and as representative of Defendants;
8) Thaina Blot;
9) Lauren Davis;
10) Arielle Freels;
11) Keisha Garnett;
12) Bianca Hall;
13) Toni Hall;
14) Veronica Johnson;
15) Aaron Noonberg, Ph.D.;
16) Camille Kibler;
17) Simone Mafa;
18) Adrienne Isom Malin;
19) Helen Peace; and
20) Cynthia Poole.

### V.　Exhibit List

| Exhibit Name | Description |
| --- | --- |
| Plaintiff Exhibit 1 | [Jane Doe] Pine Forge Academy Transcript |
| Plaintiff Exhibit 2 | [Jane Doe] Oakwood Acceptance Letter |
| Plaintiff Exhibit 3 | Rock in a Weary Land - Pine Forge Academy Choir - Compact Disc (We have the physical CD, a scan is included in exhibits exchanged) |

23

| | |
|---|---|
| Plaintiff Exhibit 4 | CV - William L. Bainbridge, Ph.D., FACFEI, DNASE |
| Plaintiff Exhibit 5 | CV - Adrienne Isom Malin |
| Plaintiff Exhibit 6 | CV - Aaron Noonberg, Ph.D. |
| Plaintiff Exhibit 7 | PFA Choir 2008, Atlanta Berean, Jason Ferdinand Director (Video) |
| Plaintiff Exhibit 8 | Someday PFA (Video) |
| Plaintiff Exhibit 9 | Pine Forge Academy Choir (2004) - Metropolitan SDA Church (Video) |
| Plaintiff Exhibit 10 | pine forge academy choir 1 (Video) |
| Plaintiff Exhibit 11 | pine forge academy choir 2 (Video) |
| Plaintiff Exhibit 12 | pine forge academy choir 3 (Video) |
| Plaintiff Exhibit 13 | pine forge academy choir 4 (Video) |
| Plaintiff Exhibit 14 | Pine Forge Academy, Seventh-day Adventist School (Video) |
| Plaintiff Exhibit 15 | Cynthia Poole Personnel File (1) |
| Plaintiff Exhibit 16 | Cynthia Poole Personnel File (2) |
| Plaintiff Exhibit 17 | Cynthia Poole Personnel File (3) |
| Plaintiff Exhibit 18 | Camille Kibler Personnel File (1) |
| Plaintiff Exhibit 19 | Camille Kibler Personnel File (2) |
| Plaintiff Exhibit 20 | Helen Peace Personnel File (1) |
| Plaintiff Exhibit 21 | Helen Peace Personnel File (2) |
| Plaintiff Exhibit 22 | Neil Thomas Personnel File (1) |
| Plaintiff Exhibit 23 | Neil Thomas Personnel File (2) |
| Plaintiff Exhibit 24 | Toni Hall Personnel File (1) |
| Plaintiff Exhibit 25 | Toni Hall Personnel File (2) |
| Plaintiff Exhibit 26 | Jason Ferdinand Personnel File (1) |
| Plaintiff Exhibit 27 | Jason Ferdinand Personnel File (2) |
| Plaintiff Exhibit 28 | Jason Ferdinand Personnel File (3) |
| Plaintiff Exhibit 29 | Jason Ferdinand Personnel File (4) |
| Plaintiff Exhibit 30 | Defendants' Responses to Plaintiff's Interrogatories Directed to Defendant Pine Forge Academy & Defendant Allegheny East Conference Corporation of Seventh-Day Adventists |
| Plaintiff Exhibit 31 | Defendants' Responses to Plaintiff's Requests for Production of Documents Directed to Defendant Pine Forge Academy & Defendant Allegheny East Conference Corporation of Seventh-Day Adventists |
| Plaintiff Exhibit 32 | Defendants' Responses to Plaintiff's Requests for Admission Directed to Defendants Pine Forge Academy and Allegheny East Conference Corporation of Seventh-Day Adventists |
| Plaintiff Exhibit 33 | Defendants' Responses to Plaintiff's Second Requests for Production of Documents Directed to Defendants Pine Forge Academy and Allegheny East Conference Corporation of Seventh-Day Adventists |

24

| | |
|---|---|
| Plaintiff Exhibit 34 | Defendants' Responses to Plaintiff's Second Requests for Admission Directed to Defendants Pine Forge Academy and Allegheny East Conference Corporation of Sevent-Day Adventists |
| Plaintiff Exhibit 35 | Pine Forge Academy Choir -- The Holy City (Video) |
| Plaintiff Exhibit 36 | Pettrich, et al. Beyond one-cutoff-fits-all: determining cutoff values for the PTSD checklist for DSM-5 (PCL-5) |
| Plaintiff Exhibit 37 | [Jane Doe] Oakwood Scholarship Letter 1 |
| Plaintiff Exhibit 38 | [Jane Doe] Oakwood Scholarship Letter 2 |
| Plaintiff Exhibit 39 | Expert Report - William L. Bainbridge, Ph.D., FACFEI, DNASE |
| Plaintiff Exhibit 40 | Expert Report - Adrienne Isom Malin |
| Plaintiff Exhibit 41 | Expert Report - Aaron Noonberg, Ph.D. |
| Plaintiff Exhibit 42 | Supplemental Expert Report – William L. Bainbridge, Ph.D., FACFEI, DNASE |
| Additional Exhibits | Any and all Exhibits identified by any other party to this action. |
| Additional Exhibits | Joint Exhibits which may exist in the future |

## VI.    **Stipulations of Counsel**

Counsel for Plaintiff and Defendants have stipulated to the following:

1.  Camille Michele Kibler passed away on February 16, 2026.

2.  The parties stipulate to the authenticity of the documents marked Defendants' Exhibit D-6 without the necessity of calling a records custodian to testify at trial.

3.  The parties stipulate to the authenticity of the documents marked Defendants' Exhibit D-7 without the necessity of calling a records custodian to testify at trial.

4.  The parties stipulate to the authenticity of the documents marked Defendants' Exhibit D-16 without the necessity of calling a records custodian to testify at trial.

5.  The parties stipulate to the authenticity of the documents marked Defendants' Exhibit D-17 without the necessity of calling a records custodian to testify at trial.

6.  The parties stipulate to the authenticity of the documents marked Defendants' Exhibit D-18 without the necessity of calling a records custodian to testify at trial.

7. The parties stipulate to the authenticity of the documents marked Defendants' Exhibit D-19 without the necessity of calling a records custodian to testify at trial.

8. The parties stipulate to the authenticity of the documents marked Plaintiff's Exhibit 1 without the necessity of calling a records custodian to testify at trial.

9. The parties stipulate to the authenticity of the documents marked Plaintiff's Exhibit 2 without the necessity of calling a records custodian to testify at trial.

10. The parties stipulate to the authenticity of the documents marked Plaintiff's Exhibit 37 without the necessity of calling a records custodian to testify at trial.

11. The parties stipulate to the authenticity of the documents marked Plaintiff's Exhibit 38 without the necessity of calling a records custodian to testify at trial.

12. Helen Peace, former Assistant Dean at Pine Forge Academy, testified at a deposition in this case, at which time Ms. Peace resided within 100 miles of the U.S. Courthouse in Allentown, PA. Ms. Peace currently lives more than 100 miles from the courthouse. Defendants stipulate to allowing Plaintiff to designate portions of Ms. Peace's video deposition testimony to be presented at trial, while preserving all substantive objections to Ms. Peace's testimony designated by Plaintiff. It is stipulated by the parties that Defendants have preserved their right to present and may present Ms. Peace's testimony live, in-person at trial during Defendants' case.

13. Toni Hall, former employee of Pine Forge Academy, testified at a video deposition in this case. The parties stipulate to presenting the testimony of Ms. Hall at trial by designating portions of Ms. Hall's deposition testimony at trial. The parties preserve all substantive objections to Ms. Hall's testimony designated by each party.

26

14. Cynthia Poole, former Principal/Headmaster at Pine Forge Academy, testified at a video deposition in this case, at which time and through the present, Ms. Poole resides more than 100 miles from the U.S. Courthouse in Allentown, PA. Defendants stipulate to allowing Plaintiff to designate portion of Ms. Poole's video deposition testimony to be presented at trial, while preserving all substantive objections to Ms. Poole's testimony designated by Plaintiff. It is stipulated by the parties that Defendants have preserved their right to present and may present Ms. Poole's testimony live, in-person at trial during Defendants' case.

15. Candace Anson testified at a videotaped deposition pursuant to Court Order after the deadline closed. Ms. Anson currently resides more than 100 miles from the U.S. Courthouse in Allentown, PA.  Defendants do not object to Plaintiff designating portions of the video deposition of Ms. Anson at trial. Defendants preserve all substantive objections to Ms. Anson's testimony designated by Plaintiff and have counter-designated portions of Ms. Anson's deposition testimony should this witness' testimony be presented at trial by Plaintiff.

## VII.  Statements of Objection

### A.  Complaint and Answer – D1 and D2

Defendants have identified Plaintiff's Complaint in this matter and Defendants' Answer in this matter as Exhibits D1 and D2, respectively. These pleadings are not themselves evidence, but contain allegations of fact, statements of law, and denials of fact that serve as a tool for parties and courts in litigating and presiding over cases. Plaintiff objects to the admittance of either document into evidence. If the Court finds that these documents are evidence, they should still be excluded under Evid.R. 403 is the probative value of the documents is substantially outweighed by the danger of confusing the issues and misleading the jury. The jury will hear ample testimony, in this

27

case about the facts that gave rise to this suit. They should be focused on the testimony not the allegations made at the beginning of the suit. Further, the Court will instruct the jury on the law at the conclusion of the evidence, and handing the jury the Complaint risks confusion over what the Court's instructions of law actually are.

There may come a time at trial when Plaintiff offers an admission of the Defendants to the jury. Plaintiff would propose reading that admission to the jury and into the record rather than the entire Complaint and Answer being offered in evidence.

### B.  Defendants' Discovery Responses – D3, D24, D25, D33,

Defendants have identified their Initial Disclosures, Interrogatory Responses, and Responses to Document Requests as Exhibits D3, D24, D25, and D33. Plaintiff objects to these documents as hearsay. To be clear, these documents are admissible if offered by the Plaintiff as Opposing Party Statements under 801(d)(2). But the Defendants cannot offer the documents on their own behalf to prove any fact.

### C.  Plaintiff's Instagram Posts – D21

Defendants have collected various Instagram posts of the Plaintiff and present them as Exhibit D21. While the posts themselves may have some marginal relevance, certain statements in them do not. Plaintiff objects to the relevancy of the following statements in the posts:

1) On Page 8 of the Exhibit (bates stamped D000628), Plaintiff made a post and commented "In ATL building with my family. For us it's about generational wealth for our family and those who we connect with along the journey." This statement has zero relevance to the case and should be redacted before shown to the jury and before the document is put into evidence.

2) On Page 23 of the Exhibit (D000643), Plaintiff made a post and Defendants have included only part of her statement as follows: "Hey guys! It's Monday and most of us

28

are stuck in the house which is very unfamiliar territory! However, right before this crisis started my dad said something to me that is really guiding how I'm approaching this quarantine. I was talking to him about my financial goals and asking for advice on how to reach them. He told me that my number one problem is that I take too many vacations! He said that I have a habit of completing a few deals and then taking a break. Instead, I need to accomplish the big financial goal first and stop taking a break every time I "win a battle" instead of the "war". I was low key offended because I work hard and like to vacation to regroup, but he caused me to get out of my feelings and listen to the deeper message. The message being, that regardless of what I've done there is still more to do. I shouldn't stop until what I see in my head I also hold in my hand. His message applies to all of us too. It may seem like with everything going on we have a natural excused to pause the plans…" This statement has zero relevance to the case and should be redacted before shown to the jury and before the document is put into evidence. Additionally, the image does not include Plaintiff's entire statement and should be struck for that reason as well.

3)  On Page 23 of the Exhibit (D000643), Plaintiff made a post and Defendants have included only part of her statement as follows: "I shared the other day about how I had a near-death experience and when I Say it shook me and woke me up y'all I'm not lying. God has given me so many tools and gifts that I've been afraid to share! This time last year I told God that I wanted to grow my business and make over 6 figures and at the end of the year when I looked at my 1099 I was floored that I reached that goal! The year before (2017) I was cleaning toilets and driving Uber just to pay my rent! & the only people who knew were my family and my best friend! After going

29

from that to only a year later making over 6 figures is wild! & After hitting that goal I said that I knew I could do anything with God's help and I vowed to help other people do the same! But I haven't been living up to it! I share little stuff here, and there, but it's nothing on the magnitude of what I know has been…" This statement has zero relevance to the case and should be redacted before shown to the jury and before the document is put into evidence. Additionally, the image does not include Plaintiff's entire statement and should be struck for that reason as well.

### D. Deposition Transcripts – D34-D44, D47, D50, D53

Defendants have identified various deposition transcripts taken in this case as Exhibits D34-D44, D47, D50, D53. While some of these depositions may be admissible if played or read to the jury, Plaintiff does object to the transcripts themselves being sent back with the jury for deliberations.

### E. Online Description of Parise Nichelle – D56

Defendants have identified as Exhibit D56 a document purporting to be an online description of a woman (Parise Nichelle) whom Plaintiff spoke with while seeking spiritual guidance. Plaintiff objects to this exhibit on authenticity grounds. When counsel attempts to visit the website listed at the bottom of each page of the document, the website cannot be reached.

Further, the document itself is incomplete. When the document is read, it is clear that not all the words that may have originally been included on the internet are present in the document. This raises authenticity issues, but also violates Evid.R. 1001-1003 regarding the admissibility of duplicates of documents.

### F. No Record Statement from Dr. Katherine Smith – D57

Defendants have identified a "No Record Statement from Dr. Katherine Smith" as Exhibit D57. However, the document provided is not from Dr. Katherine Smith and also does not state

that Dr. Katherine Smith has no records. Instead, it is a letter from Center City Legal Reproductions, Inc., which Plaintiff believes is the vendor that Defendants used to gather records in this case. The letter states that the vendor was unable to obtain records from Dr. Katherine Smith. It further states "Deponent Out of Business – Cannot Locate Deponent[.]"

Plaintiffs objects to the letter as hearsay, but also that it may be used to confuse or mislead the jury under Evid.R. 403.

### VIII.   Deposition Testimony to be Offered

#### A.  Camille Kibler

Plaintiff designates the following testimony from the deposition of Camille Kibler taken in this matter:

> Pg. 4, Ln 1 – Pg. 6 Ln. 3
>
> Pg. 12, Ln. 1 – Pg. 48, Ln. 14
>
> Pg. 49, Ln. 5 – Pg. 66, Ln. 7
>
> Pg. 66, Ln. 25 – Pg. 77, Ln. 22

Defendants will include their own designations for Camille Kibler's deposition in their Pretrial Memorandum.

#### B.  Toni Hall

Plaintiff designates the following testimony from the deposition of Toni Hall taken in this matter in the event that Toni Hall does not appear at trial:

> Pg. 4, Ln 3 – Pg. 6 Ln. 5
>
> Pg. 11, Ln. 19 – Pg. 14, Ln. 2
>
> Pg. 15, Ln. 6 – Pg. 21, Ln. 14
>
> Pg. 22, Ln. 3 – Pg. 26, Ln. 18

Defendants' counter-designations for this deposition are as follows:

31

Pg. 14, Lns. 16-19.

### C.  Helen Peace

Plaintiff has requested that Defendants' counsel accept service of a subpoena issued to Helen Peace, as Helen Peace is represented by Defendants' counsel. Plaintiff designates the following testimony from the deposition of Helen Peace taken in this matter in the event that Helen Peace does not appear at trial:

Pg. 4, Ln 3 – Pg. 5, Ln. 24

Pg. 11, Ln. 10 – Pg. 20, Ln. 22

Pg. 21, Ln. 10 – Pg. 23, Ln. 25

Pg. 24, Ln. 12 – Pg. 32, Ln. 3

Pg. 32, Ln. 13 – Pg. 43, Ln. 3

Pg. 43, Ln. 19 – Pg. 53, Ln. 17

Plaintiff has not received counter-designations for this deposition from Defendants.

### D.  Cynthia Poole

Plaintiff designates the following testimony from the deposition of Cynthia Poole taken in this matter:

Pg. 4, Ln. 1 – Pg. 5, Ln. 25

Pg. 11, Ln. 10 – Pg. 28, Ln. 7

Pg. 29, Ln. 11 – Pg. 30, Ln. 18

Pg. 31, Ln. 14 – Pg. 78, Ln. 9

Pg. 78, Ln. 16 – Pg. 101, Ln. 14

Pg. 101, Ln. 24 – Pg. 106, Ln. 23

Plaintiff has not received counter-designations for this deposition from Defendants.

### E.  Teresa Best – Corporate Representative

Plaintiff designates the following testimony from the deposition of Teresa Best, produced by the Defendants in response to a Deposition Notice under Civ.R. 30(b)(6) taken in this matter:

Pg. 5, Ln. 2 – Pg. 7, Ln. 23

Pg. 11, Ln. 8- Pg. 117, Ln. 8

Pg. 131, Ln. 1 to Pg. 154, Ln. 5

Pg. 154, Lns. 21-25

Pg. 155, Lns. 12-25

Pg. 156, Ln. 8 to Pg. 158, Ln. 9

Pg. 158, Ln. 16 to Pg. 161, Ln. 2

Pg. 162, Ln. 21 to Pg. 164, Ln. 1

Pg. 164, Ln. 9 to Pg. 167, Ln. 10

Pg. 167, Ln. 19 to Pg. 176, Ln. 23

Pg. 178, Lns. 1-5

Defendants intend on calling Ms. Best to testify live at trial and have thus indicated that counter-designations are not applicable.

### F.  Candace Anson

Plaintiff designates the following testimony from the deposition of Candace Anson taken in this matter:

Pg. 4, Ln. 4 – Pg. 6, Ln. 3

Pg. 6, Lns. 17-21

Pg. 7, Ln. 15 – Pg. 15, Ln. 17

Pg. 15, Ln. 20 – Pg. 19, Ln. 22

Pg. 20, Ln. 4 – Pg. 24, Ln. 20

Pg. 25, Ln. 2 – Pg. 30, Ln. 11

Pg. 30, Ln. 21 – Pg. 33, Ln. 18

Pg. 32, Ln. 24 – Pg. 35, Ln. 23

Pg. 36, Lns. 19-24

Pg. 42, Ln. 24 (beginning with "And then you…") – Pg. 45, Ln. 14

Pg. 45, Ln. 20 – Pg. 46. Ln. 19

Pg. 47, Ln. 22 – Pg. 48, Ln. 3

Pg. 52, Lns. 18-20

Pg. 55, Lns. 13-22

Pg. 56, Lns. 3-14

Pg. 56, Ln. 22 – Pg. 58, Ln. 19

Pg. 59, Ln. 16 – Pg. 60, Ln. 5

Pg. 61, Ln 23 – Pg. 62, Ln. 6

Pg. 62, Ln. 17 – Pg. 63, Ln. 17 (ending with "not fulfill.")

Pg. 66, Lns. 4-18

Pg. 67, Lns. 11-23

Pg. 68, Lns. 10 – Pg. 69, Ln. 13

Pg. 69, Lns. 14-24 (ending with "it.")

Pg. 75, Ln. 23 – Pg. 77, Ln. 1

Defendants' counter-designations for this deposition are as follows:

Page 39, lines 10-15

Page 49, lines 23-25

Page 50, lines 1-25

34

Page 51, lines 4-12

Page 52, lines 1-11

Page 54, lines 15-25

Page 55, lines 10-12

Page 56, lines 17-21

Page 61, lines 6-22

Page 69, lines 14-22, (ending "No" at line 22)

Page 71, lines 8-12

Page 74, lines 9-12

### G. Thaina Blot

Plaintiff designates the following testimony from the deposition of Thaina Blot taken in this matter:

Pg. 4, Lns. 8-21

Pg. 6, Ln. 8 – Pg. 9. Ln. 20

Pg. 11, Ln. 9 – Pg. 16, Ln. 3

Pg. 20, Ln. 10 – Pg. 23, Ln. 16

Pg. 27, Ln. 7 (beginning with "can you") – Pg. 29, Ln. 7

Pg. 30, Ln. 1 – Pg. 31, Ln. 1

Pg. 31, Ln. 23 – Pg. 34, Ln. 20

Pg. 35, Ln. 15 – Pg. 36, Ln. 25

Pg. 39, Ln. 8 – Pg. 43, Ln. 14

Pg. 43, Lns. 24-25

Plaintiff has not received counter-designations for this deposition from Defendants.

### IX.    Statement of Anticipated Legal Issues

Plaintiff does not anticipate any significant legal issues. The Court will likely be called on to rule on routine trial objections. Plaintiff anticipates that Defendants may make hearsay objections to certain testimony, including the designated deposition testimony as designated above. Plaintiff simply notes that a number of out of court statements will not qualify as hearsay under Evid.R. 801(c)(2) as they will not be offered to prove the truth of the matter asserted. Instead, relevant statements will be offered that tend to show Defendants' knowledge, the effect the words had on the listener, motive, etc.

If any significant issues are raised by the Defendants, Plaintiffs will be prepared to respond.

### X.    Conclusion

Plaintiff's counsel is prepared to discuss the foregoing at the Final Pretrial Conference on July 22, 2026 or sooner if the Court would find that helpful.

Respectfully submitted,

**CONSTANT LEGAL GROUP, LLP**

/s/ *Edward J. Kelley, III*
Edward J. Kelley, III Esq.
737 Bolivar Rd., Ste. 440
Cleveland, OH 44115
(216) 333-6707
(216) 274-9365 (facsimile)
ed@constantllp.com

**Attorney for Plaintiff**

36

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Plaintiff's Pretrial Memorandum was served via the

Court's ECF Filing System upon all counsel of record on this date July 1, 2026.

**CONSTANT LEGAL GROUP, LLP**

/s/ *Edward J. Kelley, III*
Edward J. Kelley, III Esq.
737 Bolivar Rd., Ste. 440
Cleveland, OH 44115
(216) 333-6707
(216) 274-9365 (facsimile)
ed@constantllp.com

**Attorney for Plaintiff**